

FILED & ENTERED

JAN 07 2025

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Cetulio    DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

In re:

STEVEN LOUIS MILLER,

Debtor.

Keri Miller and Michael Miller,

Plaintiffs,

v.

Steven Louis Miller,

Defendant.

Case No.: 1:22-bk-11019-VK

Chapter 7

Adv. No.: 1:22-ap-01062-VK

**MEMORANDUM OF DECISION AFTER TRIAL**

On November 18 and November 19, 2024, the Court conducted a trial in the above-captioned adversary proceeding. Appearances were noted on the record.

For the reasons set forth below, the Court will enter judgment in favor of Keri Miller and Michael Miller under 11 U.S.C. § 523(a)(2)(A). The Court will enter judgment in favor of Steven Louis Miller under 11 U.S.C. § 523(a)(4). This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law.

## I. BACKGROUND

On August 31, 2022, Steven Louis Miller ("Defendant") filed a voluntary chapter 7 petition, initiating bankruptcy case no. 1:22-11019. On December 12, 2022, Keri Miller and Michael Miller ("Plaintiffs") filed a complaint against Defendant, initiating this adversary proceeding. *Complaint* [doc. 1].

Defendant has been licensed by the California Contractors State Licensing Board ("CSLB") to operate as a Class B general building contractor since 1984 under license no. 474691. *Deposition of Defendant*, 46-48 [Ex. 42]. Defendant has a degree in architecture from Valley College. *Id.*

### A.     The Project, Defendant's Proposal & the Contract

In June 2019, Plaintiffs purchased a home located at 11523 Manchester Way, Porter Ranch, CA 91326 (the "Premises"). *Id.*[1] The Premises is located in the West Cliffe community of Porter Ranch. *Declaration of Keri Miller* ("Keri Miller Decl."), ¶ 10 [doc. 80]. Plaintiffs sought out a contractor to complete a pool, spa, fire pit, outdoor kitchen and complete hardscape (the "Project"). *Keri Miller Decl.*, ¶¶ 8-9 [doc. 80]; *Declaration of Michael Miller* ("Michael Miller Decl."), ¶¶ 5-6 [doc. 81].

In December 2020, Mrs. Miller found Defendant because he was working on similar projects in West Cliffe. Mrs. Miller spoke with Defendant on the phone and then met him in person. *Keri Miller Decl.*, ¶¶ 11-12 [doc. 80]. At the meeting, Defendant represented to Mrs. Miller that he could complete the Project because, as a contractor for about 40 years, he had extensive experience with constructing pools. *Keri Miller Decl.*, ¶ 14 [doc. 80]. Defendant showed Mrs. Miller two other pools he had constructed in West Cliffe. *Keri Miller Decl.*, ¶¶ 13, 15 [doc. 80]; Defendant represented to Mrs. Miller that he had built or remodeled over 120 homes in the past 44 years and was the architect for nearly all those construction projects. *Keri Miller Decl.*, ¶ 23 [doc. 80].

///

_____

[1] The Court may take judicial notice of the bankruptcy and adversary proceeding dockets. Unless this decision cites a pleading from these dockets, the trial declarations or an exhibit, all facts are derived from testimony at trial.

1    On December 10, 2020, Defendant drafted a *Preliminary Proposal Estimate* (the

2    "Proposal") [Ex. 1] in which Defendant estimated he could complete the Project for $200,000.

3    *See Proposal* [Ex. 1] (Option 1). On December 12, 2020, Defendant presented the Proposal to

4    Plaintiffs. *Keri Miller Decl.*, ¶ 17 [doc. 80]; *Michael Miller Decl.*, ¶ 10 [doc. 81]. Defendant

5    represented to Mrs. Miller that he could complete the Project within three months and had

6    personal relationships with the Los Angeles Department of Building and Safety ("LADBS")

7    inspectors, such that he could have LADBS inspectors out quickly to approve the Project. *Keri*

8    *Miller Decl.*, ¶¶ 20-21 [doc. 80].

9    Before moving forward with Defendant, Plaintiffs first consulted two other contractors,

10    both of whom offered much higher estimates with less of the features that Plaintiffs requested in

11    the Project. *Keri Miller Decl.*, ¶ 25 [doc. 80].

12    On December 13, 2020, Defendant visited the Premises to drop off a *Landscape and*

13    *Construction Proposal and Agreement* (the "Contract") [Ex. 2]. *Keri Miller Decl.*, ¶¶ 27-28 [doc.

14    80]. The Contract provides that Defendant would substantially complete the Project "on or about

15    twelve weeks from the time of pool permit issuance, 2021." *Contract*, ¶ 5 [Ex. 2]. At trial, the

16    parties testified that they executed the Contract.

17    **B.    Defendant's Business Practices as of the Contract Date**

18    Defendant testified that he would pay subcontractors and laborers on the Project in cash,

19    but he did not maintain records of such payments. *Def.'s Dep.*, at pp. 55-56, 85, 125-26 [Ex. 42].

20    Defendant would not withhold a portion of such payments for payroll taxes. *Id*. at p. 85. He

21    further admitted that he would pay himself cash from his projects, including the Project, but did

22    not maintain records of such cash payments. *Id*. at pp. 143-45, 225-27.

23    Although Defendant testified that he kept receipts for materials that he purchased for the

24    Project and for other projects in a drawer or a box in his home, Defendant did not provide them

25    to Plaintiffs. *Id*. at pp. 54, 127-31. Defendant stated that he would not be able to discern whether

26    any such receipts were related to the Project because his business practice was to purchase

27    materials for several projects in a single transaction. *Id*. at p. 130.

28

1    As for business correspondence, Defendant admitted that his practice was to let mail sit

2    unopened on his desk for long periods of time. *Id*. at pp. 103-04, 168.

3    In 2020, the CSLB changed Defendant's license status to inactive for failure to maintain

4    workers' compensation insurance. After becoming aware of the inactive status in July 2020,

5    Defendant applied for workers' compensation insurance with the State Compensation Insurance

6    Fund ("SCIF"). *Id*. at pp. 82-84. Defendant admitted listing a few employees on payroll

7    estimates he provided in his application "just to get the policy going." *Id*. at pp. 84, 117;

8    *Workers' Compensation Insurance Payroll Report* [Ex. 10]. Defendant knew at that time that he

9    had no records of such employees and would be unable to comply with the payroll audits

10    required by SCIF. On July 24, 2020, Defendant initiated a new SCIF policy under policy number

11    9280656-20 (the "July 2020 SCIF Policy"). *SCIF Invoices* [Ex. 7]; *SCIF Notice of Cancellation*

12    *dated February 16, 2021* [Ex. 8]; *SCIF Notice of Cancellation dated March 8, 2021* [Ex. 9].

13    Defendant further admitted that his practice was to initiate SCIF policies with autopay

14    enabled, only to disable autopay after paying the first month's premium. In his deposition,

15    Defendant explained his reason for disabling autopay was because he knew he was "never going

16    to have the money in [the bank account] when [he] need[ed] it." *Def.'s Dep.*, at p. 174 [Ex. 42].

17    Defendant also alleged that SCIF would disenroll him from autopay because he had "no money

18    in the account." *Id*. at p. 171. As for the SCIF policy initiated in July 2020, Defendant produced

19    no documents evidencing he paid SCIF anything other than the first payment due to initiate

20    coverage.

21    ### C.    *Defendant's Representations re Permits*

22    On December 17, 2020, Defendant visited the Premises to deliver to Plaintiffs a first

23    invoice for $8,000 (the "First Invoice"). *Keri Miller Decl.*, ¶ 32 [doc. 80]; *Invoice #00001* [Ex.

24    17]. The First Invoice lists, in relevant part, $5,000 for a line item entitled "Permits." *Invoice*

25    *#00001* [Ex. 17]. Defendant testified that the Permits line item covered the LADBS grading plan

26    check and permit fees, and also Defendant's fee for preparing a full set of working drawings and

27    the structural and soil engineers' fees.

28

On January 11, 2021, Defendant submitted to the LADBS an application for a grading permit for the Project (the "Grading Permit Application"); he did not pay the plan check and pre-inspection fees required for the LADBS to process the Grading Permit Application. *Keri Miller Decl.*, ¶ 63 [doc. 80]; *see* L.A., Cal., Code §§ 91.107.3.1–2 (2024).[2] In his deposition, Defendant testified that he had his structural engineer Solayman Hamid Azizisefat ("Hamid") submit the Grading Permit Application. *Def.'s Dep.*, at pp. 147-52 [Ex. 42]. Defendant explained that he told Mrs. Miller that the Grading Permit Application had been submitted because Hamid told Defendant that he had done so. *Id.* at p. 150. At trial, Defendant testified that he did not confirm in writing with Hamid; Defendant allegedly spoke with him on the phone.

Defendant's explanation for Hamid not having submitted the Grading Permit Application—despite Defendant having represented otherwise to Mrs. Miller—was that Hamid was working on the Project and another pool construction project on the same street as the Premises, causing Hamid to believe that the two projects were "just one job." *Id.* at p. 149. Defendant did not produce any documentary evidence to support his allegation that Hamid applied for a pool permit at a nearby address in January.

On January 12, 2021, Mrs. Miller sent a text message to Defendant stating, "Hey we haven't seen your guys in a few weeks. Did you forget about us?" *Text Messages between Mrs. Miller and Defendant* [Ex. 19]. On January 13, 2021, Defendant responded:

> I should be excavating the pool within a few days. The tile is expected delivery Friday morning. We are going to bring in a different piece of equipment to excavate the pool rather than have the guys hand dig the detail!

*Id.* On January 14, 2021, Defendant sent a text message to Mrs. Miller stating, "Engineer is finishing up and has just one question." *Id.* On January 21, 2021, Defendant sent another text message stating:

---

[2] A grading permit is required for excavations when the pool requires a combined building-mechanical permit and the lot is located in a grading hillside area. L.A., Cal., Code § 91.106.1.2 (2024). A grading permit is a separate requirement from a combined-building mechanical permit, which is required to construct a private pool. L.A., Cal., Code § 91.107.2.2 (2024); see also LADBS, P/BC 2023-014, Design and Construction of Swimming Pools, ¶¶ III.1.b-c (2023), https://ladbs.org/docs/default-source/publications/information-bulletins/building-code/design-and-construction-of-swimming-pools-ib-p-bc2017-014.pdf.

Our plans are finished and the engineering is finished. **We have submitted for the permit.** We did get the pre-grading inspection and we can excavate the pool. The problem is it's supposed to rain Monday and I'm not sure what I want to do yet, but I will let you know as soon as possible!

*Id.* (emphasis added).

On January 29, 2021, an LADBS inspector visited the Premises unannounced and told Mrs. Miller that Plaintiffs could not move forward with the Project without having a permit. *Keri Miller Decl.*, ¶ 43 [doc. 80]. On January 30, 2021, Defendant sent a text message to Mrs. Miller stating, "The inspector just came by. He said he will email you." *Text Messages between Mrs. Miller and Defendant* [Ex. 19].

On February 9, 2021, Defendant issued a second invoice in which Defendant indicated that the line item entitled "Permits" was "completed." *Invoice #00002* [Ex. 17]. Each invoice that Defendant subsequently provided also indicated the line item entitled "Permits" was "completed." *Invoice #00003-10* [Ex. 17].

In February 2021, Defendant brought a tractor to the Premises and began excavating the pool. *Keri Miller Decl.*, ¶ 45 [doc. 80]. Defendant worked on the Project intermittently through April 2021. *Id.*, ¶¶ 47-50. Assuming the grading permit and the combined building-mechanical permit for the Project (respectively, the "Grading Permit" and "Pool Permit," and together, the "Permits") had been issued in January as Defendant represented to Plaintiffs, at this point Defendant had already missed the Project completion date.

On April 16, 2021, Defendant purportedly resubmitted the Grading Permit Application under permit no. 21030-30000-02514 and plan check/job no. B21WL01677. *Text Messages between Mrs. Miller and Phillip Polanco* [Ex. 40]. For a second time, Defendant did not pay the plan check and pre-inspection fees required for the LADBS to process the Grading Permit Application. *Keri Miller Decl.*, ¶ 63 [doc. 80]; *see* L.A., Cal., Code §§ 91.107.3.1–2 (2024).

On April 21, 2021, Mrs. Miller sent Defendant a text message stating:

Good morning – We have a good friend who works for the city doing inspections and permits in this area. He said we should not be waiting this long and if we tell him what we are waiting on he can check on it for us. We have been working on this job for over 4 months. He said maybe something got lost [because] it should not be this long. Also Shanti said her pool was done in two months. Please let me

know what permit we are waiting for so we can look into it and get things moving.
Thank you!

*Text Messages between Mrs. Miller and Defendant* [Ex. 19]. Defendant replied, stating in
relevant part, "We will have your pool completed one month after permit." *Id.*

On May 13, 2021, Mrs. Miller sent a text message to Phillip Polanco, an LADBS deputy
building inspector, to inquire about the status of the Permits. *Text Messages between Mrs. Miller
and Phillip Polanco* [Ex. 40]. Mr. Polanco searched the address of the Premises on the LADBS's
online permit status tool. *Id.* He then sent screenshots of his search showing that the Grading
Permit Application was submitted on April 16, 2021. *Id.* Mr. Polanco advised Mrs. Miller that
the Grading Permit Application was currently pending and that the LADBS was "really backed
up." *Id.* Thereafter, Mrs. Miller forwarded the screenshots to Defendant, who appeared at the
Premises within ten minutes. *Keri Miller Decl.*, ¶¶ 65-66 [doc. 80]. Defendant told Mrs. Miller
that he would "resolve the payments on [the Permits] first thing in the morning." *Id.,* ¶ 66.

The next day, on May 14, 2021, Defendant revisited Mrs. Miller at the Premises "with
proof that he had just paid for [the Permits]" and alleging that Hamid inadvertently did not
submit the Grading Permit Application. *Id.,* ¶ 67. Defendant then promised Plaintiffs "a hard and
fast completion date for the [P]roject of July 3, 2021 . . . ." *Id.,* ¶ 69. Defendant did not provide
copies of the Permits to Mrs. Miller at this meeting.

The Permits were not issued until December 14, 2021. *Copy of Permit Report* [Ex. L]. It
appears that the subsequent contractor hired by Plaintiffs finally obtained the issuance of the
Permits.

### D.    Parties' Relationship Ends

In the months thereafter, the relationship between the parties further deteriorated. On
September 10, 2021, Mrs. Miller called the LADBS, who informed her that it had not conducted
the necessary inspections or issued the Permits. *Id.* Defendant represented that the LADBS plan
checker was responsible for the delay in obtaining Permits. *Keri Miller Decl.*, ¶ 82; *Email
Thread between Parties* [Ex. 22]. On September 13, 2021, Plaintiffs emailed Defendant,
declaring breach of contract and firing Defendant. *Email Thread between Parties* [Ex. 22].

### E.    Cancellation of July 2020 SCIF Policy

In March 2021, SCIF cancelled the July 2020 SCIF Policy because of Defendant's "[f]ailure to pay premium[s] and submit payroll reports when due." *SCIF Notice of Cancellation dated February 16, 2021* [Ex. 8]. As was his business practice, Defendant had paid only the first month's premium on the July 2020 Policy; he did not pay the seven premiums due thereafter. *Id*. In his deposition, Defendant admitted that he remembered "receiving requests many times for payroll records." *Def.'s Dep.*, at p. 102 [Ex. 42].

In July 2021, the CSLB again changed Defendant's license status to inactive for Defendant's failure to maintain workers' compensation insurance. *Email Thread between Parties* [Ex. 22]. Defendant never informed Plaintiffs of the inactive status of his contractor license and did not stop acting as a contractor on the Project.

### F.    Plaintiffs' CSLB Complaint

On September 20, 2021, Mrs. Miller discovered that the July 2020 SCIF Policy was cancelled in May 2021 and that Defendant's license had been inactive since July 2021. *Keri Miller Decl.*, ¶¶ 84-85 [doc. 80]. She then filed a complaint against Defendant's contractor license ("Plaintiffs' CSLB Complaint"). *Id*. The next day, Plaintiffs emailed Defendant regarding the inactive status of his license. *Email Thread between Parties* [Ex. 22]. Defendant alleges that he was not aware that the CSLB had changed his license status to inactive until being so informed by Plaintiffs' email. *Def.'s Dep.*, at pp. 168, 175-76 [Ex. 42].

Thereafter, the CSLB notified Defendant of Plaintiffs' CSLB Complaint and requested Defendant provide the CSLB with any information he had regarding the Project. *CSLB Letter dated January 26, 2022* [Ex. 29]. On January 26, 2022, the CSLB sent a letter to Defendant informing him that the CSLB referred Plaintiffs' CSLB Complaint for investigation by another licensed contractor acting as an industry expert. *Id*. Thereafter, an industry expert inspected the Premises and prepared a report (the "CSLB Industry Expert Report"). *Keri Miller Decl.*, ¶ 95 [doc. 80]; *CSLB Industry Expert Report* [Ex. 30]. On February 16, 2022, a special investigator with the CSLB met with Mrs. Miller at the Premises to investigate Plaintiffs' CSLB Complaint. ///

On September 12, 2022, the CSLB issued Defendant a citation (the "CSLB Citation"). *CSLB Citation* [Ex. 31]. The CSLB Citation found, in relevant part, that Defendant violated the California Contractor License Law as follows:

1. Failed to obtain [Permits] on the [P]roject . . .;
2. Acted as a contractor while the license was suspended; [and]
3. Failed to secure workers' compensation coverage for employees . . . .

*Id.* nos. 2-4. The CSLB Citation became a final order unless Defendant contested its findings by October 3, 2022. *Id.* At trial, Defendant testified that he contested the CSLB Citation but does not have any documents evidencing this. Defendant did not produce to Plaintiffs any documents evidencing that he contested the CSLB Citation.

### A.   *Plaintiffs' Financial Consequences*

In total, Defendant invoiced Plaintiffs $209,800 on the Project, of which Plaintiffs paid $175,400 by check. *Invoice #00001-10* [Ex. 17]; *Checks from Plaintiffs to Defendant* [Ex. 18]; *Keri Miller Decl.*, ¶ 36 [doc. 80]. Plaintiffs did not pay the final invoice for $11,600. Each invoice states above Plaintiffs' signature line, "All Work Approved and Accepted to Date." *Invoice #00001-10* [Ex. 17].

The CSLB Industry Expert Report contains findings by the industry expert on the "costs to correct items" of work that were the subject of Plaintiffs' CSLB Complaint. *CSLB Industry Expert Report* [Ex. 30]. Specifically, the industry expert found that Plaintiffs' costs to correct totaled $68,450. *Id.* (item nos. 2, 4-7, 12-15, 18-20). This includes costs to correct work that Defendant had not yet done, even though Plaintiffs already paid Defendant for such work. *Id.* (item nos. 4-7, 14-18).

After firing Defendant, Plaintiffs paid a different contractor, Green Paradise, $183,000 to complete the Project. *Keri Miller Decl.*, ¶ 88 [doc. 80]. On December 14, 2021, Green Paradise obtained the LADBS's approval of the Permits, which used Defendant's structural and soil engineering drawings in part. *Copy of Permit Report* [Ex. L]. Green Paradise had to demolish and rebuild more than half of the Project. *Keri Miller Decl.*, ¶ 92 [doc. 80]. As a result, the Project was not completed until late 2022. *Id.*

### 1. *Attorney's Fees and Costs*

On December 5, 2024, Plaintiffs filed a supplemental brief regarding damages ("Plaintiffs' Damages Supplement") [doc. 98]. Defendant also filed a supplemental brief [doc. 97]. In Plaintiffs' Damages Supplement, Plaintiffs represent that, in or about November 2021, they paid $500 to attorney Glenn Stevens to write a letter to Defendant's attorney regarding the Project. *Keri Miller Decl.*, ¶ 105 [doc. 80]; *Letter from Glenn Stevens dated November 2, 2021* [Ex. 49].

On June 9, 2022, prior to Defendant filing his bankruptcy petition, Plaintiffs filed a complaint against Defendant in the Superior Court of California, County of Los Angeles, initiating case no. 22CHCV00418 (the "State Court Action"). *State Court Action Complaint* [Ex. 46]. Plaintiffs retained attorney Jason Cirlin and Robert Goldberg of Cirlin Goldberg LLP to represent them in the State Court Action. *Keri Miller Decl.*, ¶ 107 [doc. 80]. Plaintiffs incurred $4,753.62 in fees and costs owed to Cirlin Goldberg LLP after adjusting for a discount the firm provided to Plaintiffs. *Declaration of Daren M. Schlecter*, ¶¶ 3-6 and Exhibit 1 thereto [doc. 98]. The billing records for Cirlin Goldberg LLP show that Mr. Cirlin and Mr. Goldberg's rates were $400 per hour. *Id*.

After Defendant filed his bankruptcy case, Plaintiffs retained Daren M. Schlecter of the Law Office of Daren M. Schlecter to represent Plaintiffs in Defendant's bankruptcy case and this adversary proceeding. *Keri Miller Decl.*, ¶ 109 [doc. 80]; *Id.,* ¶ 7. Mr. Schlecter's rate is $400 per hour. *Id.,* ¶ 14. To date, Plaintiffs have incurred $59,502 in fees and costs owed to Mr. Schlecter after adjusting for discounts Mr. Schlecter provided to Plaintiffs. *Id*., ¶¶ 11-17 and Exhibit 2 thereto. This figure excludes any fees and costs Plaintiffs incurred before Mr. Schlecter was retained to file the Complaint, e.g., general creditor representation, attendance at the § 341(a) meeting of creditors, etc. *Plaintiffs' Damages Supplement*, n.3, at pp. 23 of 64 [doc. 98]. Plaintiffs also anticipate incurring fees in the amount of $920 for Mr. Schlecter to prepare for and appear at the hearing on the trial ruling set for December 19, 2024. *Id.,* ¶ 14.

///

///

### B.    *Defendant's Project with Ms. Tehrani*

On January 5, 2020, Ms. Tehrani hired Defendant to landscape and construct a pool at her home located a few houses down from the Premises (the "Tehrani Project"). *Declaration of Michelle Tehrani* ("Tehrani Decl."), ¶ 4 [doc. 82]. Defendant promised to complete the Tehrani Project in six months. *Id.,* ¶ 6.

In early January 2020, Ms. Tehrani paid Defendant $5,000 to obtain permits for the Tehrani Project. *Id.,* ¶ 9. In the months thereafter, Defendant represented to Ms. Tehrani that he had submitted the necessary permit applications. *Id.,* ¶¶ 11-12. Defendant gave repeated excuses for the delay in completing the Tehrani Project while simultaneously taking on and completing other pool construction projects at nearby houses. *Id.,* ¶¶ 13-16.

On September 29, 2020, Ms. Tehrani searched the LADBS's online permit status tool and discovered that Defendant had not submitted any permit applications for the Tehrani Project. *Id.,* ¶¶ 18-19. Thereafter, Ms. Tehrani hired a different contractor to complete the Tehrani Project. *Id.,* ¶ 21. Ms. Tehrani suffered additional expenses in replacing Defendant and significant delays in the completion of the Tehrani Project beyond what Defendant had promised. During the pendency of the Tehrani Project, Defendant never informed Ms. Tehrani that he did not maintain workers' compensation insurance or that his contractor license was inactive.

## II.    LEGAL STANDARDS

The plaintiff's burden of proof in a nondischargeability action under 11 U.S.C. § 523(a) is "the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

### A.    *11 U.S.C. § 523(a)(2)(A)*

A bankruptcy discharge does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – false pretenses, a false representation, or actual fraud, other than a statement respecting a debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

///

///

### Actual Fraud

In *Husky International Electronics v. Ritz*, 578 U.S. 355, 136 S.Ct. 1581, 194 L.Ed.2d 655 (2016), the Supreme Court clarified that misrepresentation is not an element of actual fraud under section 523(a)(2)(A), and that actual fraud may include a wider array of misconduct. *In re Phillips*, 2016 WL 7383964, at *5 (B.A.P. 9th Cir. Dec. 16, 2016). "The term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud . . . that can be effected without a false representation." *Husky*, 578 U.S. at 359.

"The word 'actual' has a simple meaning in the context of common-law fraud: It denotes any fraud that 'involv[es] moral turpitude or intentional wrong.'" *Id.* at 360 (quoting *Neal v. Clark*, 95 U.S. 704, 709 (1877)). "'Actual' fraud stands in contrast to 'implied' fraud or fraud 'in law,' which describe acts of deception that 'may exist without the imputation of bad faith or immorality.'" *Id.*

### False Pretenses and False Representation

A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation or conduct intended to create and foster a false impression. *In re Reingold*, 2013 WL 1136546, *3 n.4 (B.A.P. 9th Cir. Mar. 19, 2013); *Shannon v. Russell (In re Russell)*, 203 B.R. 303, 312 (Bankr. S.D. Cal. 1996). To prevail on a § 523(a)(2)(A) claim concerning false pretenses or false representation, plaintiffs must prove by a preponderance of the evidence the following five elements:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor;
> (2) knowledge of the falsity or deceptiveness of his statement or conduct;
> (3) an intent to deceive;
> (4) justifiable reliance by the creditor on the debtor's statement or conduct; and
> (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*In re Weinberg*, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009) (citing *In re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000)).

### 1.   Misrepresentation, Fraudulent Omission or Deceptive Conduct

"'It is well recognized that silence, or the concealment of a material fact, can be the basis of a false impression which creates a misrepresentation actionable under § 523(a)(2)(A).'"

*Loomas v. Evans (In re Evans)*, 181 B.R. 508, 514 (Bankr. S.D. Cal. 1995) (quoting *Minority Equity Capital Corporation v. Weinstein*, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983)). *See also In re Daquila*, 2011 WL 3300197 (B.A.P. 9th Cir. Feb. 28, 2011) ("A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and possessed an intent to deceive."); *In re Miller*, 310 B.R. 185, 196 (Bankr. C.D. Cal. 2004) ("The concealment or omission of material facts that a party has a duty to disclose can support the nondischargeability of a debt on the grounds of actual fraud.").

"Under common law, a false representation can be established by an omission when there is a duty to disclose." *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1082 (9th Cir. 1996). Courts "look to the Restatement (Second) of Torts for guidance in determining what constitutes a fraudulent nondisclosure for purposes of § 523(a)(2)(A)." *In re Belice*, 461 B.R. 564, 580 n.10 (B.A.P. 9th Cir. 2011). The Restatement provides, in relevant part:

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
> . . .
>
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
>
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so . . . .

Restatement (Second) of Torts § 551 (Am. L. Inst. 1977). The official comments accompanying Restatement § 551 explain the meaning of clause (c) as follows:

> One who, having made a representation which when made was true or believed to be so, remains silent after he has learned that it is untrue and that the person to whom it is made is relying upon it in a transaction with him, is morally and legally in the same position as if he knew that his statement was false when made.

*Id.* at cmt. h.

///

-13-

"[A] party to a business transaction has a duty to disclose when the other party is ignorant of material facts which he does not have an opportunity to discover." *Apte v. Japra (In re Apte)*, 96 F.3d 1319, 1324 (9th Cir. 1996). "[T]he plaintiff must establish that the debtor concealed facts and that the facts concealed were material. A concealed fact is material if 'a reasonable man would attach importance to the alleged omission in determining his course of action.'" *Evans*, 181 B.R. at 515 (quoting *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975)).

### 2.     Knowledge of Falsity and Intent to Deceive

Representations made without an intent to perform satisfy the first three requirements of § 523(a)(2)(A). *In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989). A promise also can be considered fraudulent when the promisor knew or should have known of his inability to perform. *In re Barrack*, 217 B.R. 598, 606 (B.A.P. 9th Cir. 1998). "[A] statement made with reckless indifference to the truth is sufficient to satisfy the requirement of a fraudulent representation by the plaintiff." *Id.* (citing *In re Anastas*, 94 F.3d 1280, 1286 (9th Cir. 1996); and *In re Ettell*, 188 F.3d 1141, 1145 n.4 (B.A.P. 9th Cir. 1999).

Because intent is difficult to prove through direct evidence, it "may be established by circumstantial evidence, or by inferences drawn from a course of conduct. Therefore, in determining whether the debtor had no intention to perform, a court may look to all the surrounding facts and circumstances." *In re Barrack*, 217 B.R. 598, 607 (B.A.P. 9th Cir. 1998); *see also In re Eashai*, 87 F.3d 1082, 1087 (9th Cir. 1996) ("[A] court may infer the existence of the debtor's intent . . . if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor."). "The scienter requirement for a fraudulent misrepresentation is established by showing either actual knowledge of the falsity of a statement, or reckless disregard for its truth." *In re Gertsch*, 237 B.R. 160, 167 (9th Cir. 1999) (internal quotation omitted).

### 3.     Justifiable Reliance

As to the fourth requirement, "a creditor's reliance on a debtor's misrepresentation need be only justifiable, not reasonable, to except a debt from discharge under § 523(a)(2)(A)...." *In re Eashai*, 87 F.3d 1082, 1090 (9th Cir. 1996) (citing *Field v. Mans*, 516 U.S. 59, 75 (1995)).

1   Justifiable reliance takes into account the "qualities and characteristics of the particular plaintiff,

2   and the circumstances of the particular case, rather than of the application of a community

3   standard of conduct to all cases." *Field v. Mans*, 516 U.S. at 71. Thus, a plaintiff does not have a

4   duty to investigate. *Id*. at 70, 73-75 n.12.

5              ***4.       Proximate Causation***

6         As to the fifth requirement, § 523(a)(2)(A) requires that the damage to the creditor be

7   proximately caused by the debtor's fraud. *In re Sabban*, 600 F.3d 1219, 1223 (9th Cir. 2010)

8   (citing *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998)) (explaining that the debtor will not

9   receive a discharge of debts "resulting from" or "traceable" to fraud). "Further, as the Supreme

10  Court explained in *Field,* a court may turn to the Restatement (Second) of Torts (1976), 'the

11  most widely accepted distillation of the common law of torts,' for guidance on this issue." *In re*

12  *Russell*, 203 B.R. 303, 313 (Bankr. S.D. Cal. 1996) (citing *Field v. Mans*, 516 U.S. 59, 70

13  (1995)).

14        Turning to the Restatement, proximate cause entails "(1) causation in fact, which requires

15  a defendant's misrepresentations to be a 'substantial factor in determining the course of conduct

16  that results in [the plaintiff's] loss,' § 546; and (2) legal causation, which requires the plaintiff's

17  loss to have been 'reasonably expected to result from the reliance,' § 548A." *Id*. (citing *In re*

18  *Siriani*, 967 F.2d 302, 306 (9th Cir. 1992) and Restatement (Second) of Torts §§ 546, 548A (Am.

19  L. Inst. 1976)). "In determining the presence of proximate cause, however, courts must refrain

20  from relying on speculation to determine whether and to what extent a creditor would have

21  suffered a loss absent fraud." *Id*.

22  ///

23         ***B.       11 U.S.C. § 523(a)(4)***

24        A bankruptcy discharge does not discharge an individual debtor from any debt "for fraud

25  or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. §

26  523(a)(4). For purposes of section 523(a)(4), federal law and not state law controls the definition

27  of "embezzlement." *In re Wada*, 210 B.R. 572, 576 (B.A.P. 9th Cir. 1997). "Embezzlement is

28  defined as 'the fraudulent appropriation of property by a person to whom such property has been

[e]ntrusted or into whose hands it has lawfully come.'" *Id.* (quoting *Moore v. United States*, 160 U.S. 268, 269 (1885)).

The proponent of the nondischargeability determination must prove: (1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than that for which it was entrusted; and (3) circumstances indicating fraud. *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991); *In re Peltier*, 643 B.R. 349, 360 (B.A.P. 9th Cir. 2022). With respect to establishing nondischargeability of a debt for embezzlement, a fiduciary relationship is not required. *Littleton*, 942 F.2d at 555.

"'[E]mbezzlement requires a showing of wrongful intent.'" *Peltier*, 643 B.R. at 360 (quoting *Bullock v. BankChampaign*, *N.A.*, 569 U.S. 267, 274 (2013)). "[W]rongful intent in this context has been described as 'moral turpitude or intentional wrong' or 'felonious intent.'" *Id.* "Courts to consider the scienter requirement for an embezzlement claim consistently have ruled, or otherwise stated, that a claim of embezzlement requires a specific intent to defraud." *In re Razavi*, 539 B.R. 574, 600 (Bankr. N.D. Cal. 2015). "A wrongful appropriation of property under an erroneous belief of entitlement does not equate to the fraudulent intent necessary for embezzlement." *In re McVay*, 461 B.R. 735, 745 (Bankr. C.D. Ill. 2012).

"Fraudulent appropriation requires an intent to deprive, which can be inferred from the conduct of the person accused and from the circumstances of the situation." *Savonarola v. Beran*, 79 B.R. 493, 496 (Bankr. N.D. Fla. 1987). "Circumstances indicating fraud can be situations where the debtor intended to conceal the misappropriation." *In re Campbell*, 490 B.R. 390, 402 (Bankr. D. Ariz. 2013) (holding debt nondischargeable based on embezzlement when, among other things, debtor failed to provide financial information, even after repeated requests) (quotations and citation omitted).

### C.    *Laws Governing California Contractors*

The California Contractors State License Law (Cal. Bus. & Prof. Code §§ 7000–7191) provides in relevant part that contractors may be disciplined for:

[d]iversion of funds or property received for prosecution or completion of a specific construction project or operation, or for a specified purpose in the prosecution or completion of any construction project or operation, or failure substantially to

account for the application or use of such funds or property on the construction
project or operation for which such funds or property were received . . . .

Cal. Bus. & Prof. Code § 7108. Contractors also may be disciplined for "[f]ailure to make and
keep records showing all contracts, documents, records, receipts, and disbursements . . . for a
period of not less than five years after completion of any construction project or operation to
which the records refer." Cal. Bus. & Prof. Code § 7111(a).

Moreover, "[a]cting in the capacity of a contractor under any license which has been
made inactive, as provided in Section 7076.5,[3] constitutes a cause for disciplinary action." Cal.
Bus. & Prof. Code § 7117.5.

### D.    Recoverable Attorney's Fees and Costs

In an exception to discharge action under 11 U.S.C. § 523, an award of attorney's fees
must have a basis in statute or contract, and the conduct giving rise to attorney's fees must be
independently sufficient to support an exception to discharge. *See In re Sabban*, 600 F.3d 1219,
1223-24 (9th Cir. 2010).

Cal. Bus. & Prof. Code § 7160 provides:

> Any person who is induced to contract for a work of improvement, including but
> not limited to a home improvement, in reliance on false or fraudulent
> representations or false statements knowingly made, may sue and recover from
> such contractor or solicitor a penalty of five hundred dollars ($500), plus reasonable
> attorney's fees, in addition to any damages sustained by him by reason of such
> statements or representations made by the contractor or solicitor.

Cal. Bus. & Prof. Code § 7168 further provides:

> In any action between a person contracting for construction of a swimming pool
> and a swimming pool contractor arising out of a contract for swimming pool
> construction, the court shall award reasonable attorney's fees to the prevailing party.

The party requesting recovery of attorney's fees bears the burden of proving that the fees
sought are reasonable. *See, e.g., Ctr. for Biological Diversity v. Cty. of San Bernardino*, 188

---

[3] Cal. Bus. & Prof. Code § 7076.5 sets forth the procedure for renewal of inactive licenses and states, in
relevant part, that "[t]he holder of an inactive license shall not be entitled to practice as a contractor until
his or her license is reactivated." Cal. Bus. & Prof. Code § 7076.5(a).

Cal.App.4th 603, 615 (Ct. App. 2010); *In re Atwood*, 293 B.R. 227, 233 (B.A.P. 9th Cir. 2003).

Both California state courts and the Ninth Circuit Court of Appeals customarily assess the

reasonableness of attorneys' fees utilizing the "lodestar" approach where the number of hours

reasonably expended is multiplied by a reasonable hourly rate. *Ketchum v. Moses*, 24 Cal.4th

1122, 1131 (2001); *In re Eliapo*, 468 F.3d 592, 598 (9th Cir. 2006). "A district court should

exclude from the lodestar amount hours that are not reasonably expended because they are

'excessive, redundant, or otherwise unnecessary.'" *Van Gerwen v. Guarantee Mut. Life Co.*, 214

F.3d 1041, 1045 (9th Cir. 2000) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct.

1933, 1939-40, 76 L.Ed.2d 40 (1983)).

### E.    *Prejudgment Interest*

"'[T]he award of prejudgment interest in a case under federal law is a matter left to the

sound discretion of the trial court. Awards of prejudgment interest are governed by

considerations of fairness and are awarded when it is necessary to make the wronged party

whole.'" *In re Acequia, Inc.*, 34 F.3d 800, 818 (9th Cir. 1994) (quoting *Purcell v. United States*,

1 F.3d 932, 942-43 (9th Cir. 1993)). "An award of prejudgment interest in a § 523 proceeding in

which the creditor prevails ensures the creditor is made whole and has a full recovery." *Del

Valle*, 577 B.R. at 810–11 (citing *Cohen*, 523 U.S. at 222–23).

"It is settled that where a debt that is found to be nondischargeable arose under state law,

'the award of prejudgment interest on that debt is also governed by state law.'" *In re Weinberg*,

410 B.R. 19, 37 (9th Cir. BAP 2009) (quoting *In re Niles*, 106 F.3d 1456, 1463 (9th Cir. 1997)).

In turn, Cal. Civ. Code § 3288 provides that, "[i]n an action for the breach of an obligation not

arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in

the discretion of the jury." Under Cal. Civ. Code § 3287(a), "prejudgment interest runs from the

date when the damages are of a nature to be certain or capable of being made certain by

calculation and when the exact sum due to the plaintiff is made known to the defendant." *Levy-

Zentner Co. v. S. Pac. Transportation Co.*, 74 Cal. App. 3d 762, 798, 142 Cal. Rptr. 1, 25 (Ct.

App. 1977).

///

"The federal prejudgment interest rate applies to actions brought under federal statute, such as bankruptcy proceedings, unless the equities of the case require a different rate." *Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 871 (9th Cir. 2001). "Under federal law the rate of prejudgment interest is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate." *United States v. Gordon*, 393 F.3d 1044, 1063 n.12 (9th Cir. 2004). In turn, 28 U.S.C. § 1961 provides that the interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."

## III. ANALYSIS

### A. 11 U.S.C. § 523(a)(2)(A)

Plaintiffs have shown by a preponderance of the evidence that Defendant made false representations, made fraudulent omissions and engaged in deceptive conduct in connection with the Project.

#### 1. Defendant's Misrepresentations, Knowledge of Falsity and Intent to Deceive

In *Evans*, the debtor and the plaintiff met at their country club and formed a friendship playing golf. 181 B.R. at 510. Eventually, the debtor approached the plaintiff about borrowing $110,000 to pay off a judgment lien. *Id*.

As security for part of the $110,000 loan, the debtor executed a second deed of trust on a vacant lot he owned in favor of the plaintiff. *Id*. at 511. The debtor represented that the value of the lot exceeded the $65,000 first deed of trust plus the $65,000 second deed of trust and that the lot was "buildable." *Id*. at 512. However, the debtor was aware that a permit to build on the lot could not be obtained due to the lack of an adequate easement. *Id*. at 515. For this reason, the debtor had originally purchased the vacant lot for a price materially less than that of other properties in the same development. *Id*. In addition, the debtor had applied multiple times for a permit to build on the lot, and each time his application had been denied. *Id*.

///

The debtor did not inform the plaintiff that the lot was not buildable in its present state, that his applications for a permit had been denied or that anyone who decided to build on the lot would have to pursue costly proceedings or purchase additional property to build an easement. *Id*. The *Evans* court found that these facts were material, that "the debtor intentionally concealed these facts to mislead the plaintiff" and that the plaintiff "undoubtedly would have attached importance [to these facts] in deciding whether or not to make the loan." *Id*.

Like the debtor in *Evans*, Defendant knowingly concealed material facts regarding his ability to complete the Project in order to induce Plaintiffs to hire him. *See id.* at 512-15. In *Evans*, the debtor knew that the lot was not buildable in its present state, that his applications for a permit had been denied or that anyone who decided to build on the lot would have to pursue costly proceedings or purchase additional property to build an easement. *Id*.

Here, Defendant initially represented that he would substantially complete the Project "on or about twelve weeks from the time of pool permit issuance, 2021." Defendant then invoiced Plaintiffs for a line item regarding "Permits," which Plaintiffs paid. In each invoice thereafter, Defendant misrepresented that the "Permits" line item was "completed." However, for both times that Defendant purportedly submitted the Grading Permit Application, he did not pay the plan check and pre-inspection fees required for the LADBS to process it. After missing the Project completion date that Defendant had promised Plaintiffs, Defendant made subsequent misrepresentations that he would complete the Project "one month after permit," and later by July 3, 2021, after having missed the "one month" completion date. As further evidence that Defendant's conduct with Plaintiffs was part of his normal course of business, Defendant's relationship with Michelle Tehrani is instructive. Considering the facts and circumstances, the Court finds that Defendant made these statements with reckless indifference to the truth. *See Gertsch*, 237 B.R. at 167.

Moreover, Defendant misrepresented the status of his license and workers' compensation insurance by fraudulent omission. During the Project, Defendant held himself out to Plaintiffs to be a licensed contractor despite his license being in "inactive" status beginning July 2021. Plaintiffs reasonably attached importance to Defendant's licensure in determining which

contractor to hire for the Project because Plaintiffs understood that an unlicensed contractor could expose them to liability for any potential injury of a laborer on the Project. *See Evans*, 181 B.R. at 515. Defendant knew that failure to maintain workers' compensation insurance would cause the CSLB to change his license status to inactive, because the CSLB had done so the year before for the same reason. Accordingly, Defendant had a duty to disclose the material fact that his license was inactive, and his silence constituted a fraudulent omission under § 523(a)(2)(A). *See Apte*, 96 F.3d at 1324.

When Defendant initiated the July 2020 SCIF Policy, he knew that he would be unable to comply with the audit requirements or pay the monthly premiums such that SCIF would again cancel his policy. Regarding audit requirements, Defendant admits that he would list a few employees on payroll estimates "just to get the policy going." Defendant recalled receiving requests for payroll records "many times," but he never provided them to SCIF and could not have possibly done so because he maintained no records of his employees. Regarding payments, Defendant's practice was to pay only the first month's premium to initiate coverage. In keeping with this practice, Defendant did not pay any of the subsequent monthly premiums on the July 2020 SCIF Policy. Accordingly, Defendant had a duty to disclose that he would not maintain his workers' compensation insurance during the Project, and his silence constituted a fraudulent omission under § 523(a)(2)(A). *See Apte*, 96 F.3d at 1324.

///

### 2.    *Plaintiffs' Justifiable Reliance*

Plaintiffs have demonstrated by a preponderance of the evidence that they justifiably relied on Defendant's representations. Plaintiffs first received credible information that no permits had been issued on September 10, 2021, when Mrs. Miller called the LADBS. Plaintiffs first received credible information that Defendant's license was inactive and that he did not have workers' compensation insurance on September 20, 2021, when Mrs. Miller filed Plaintiffs' CLSB Complaint. Even though a plaintiff does not have a duty to investigate, Mrs. Miller did so. *See Field v. Mans*, 516 U.S. at 70, 73-75 n.12. Considering the qualities and characteristics of the Plaintiffs, particularly Mrs. Miller, in hiring Defendant, she justifiably relied on Defendant's

representations that he would complete the Project on time, would obtain the Permits without delay and would remain a licensed contractor for the duration of the Project. *See id*. at 71.

**B.      11 U.S.C. § 523(a)(4)**

Plaintiffs have not met their burden of proving that Defendant embezzled money from Plaintiffs. Plaintiffs suggest that Defendant committed embezzlement when Defendant invoiced Plaintiffs $5,000 for the "Permits" line item, even though he never obtained the Permits. However, Defendant testified that the Permits line item covered the LADBS grading plan check and permit fees, and also Defendant's fee for preparing a full set of working drawings and the structural and soil engineers' fees. At trial, Plaintiffs admitted that its replacement contractor obtained the LADBS's approval of the Permits by using Defendant's structural and soil engineering drawings in part. Accordingly, Plaintiffs have not established what portion, if any, of the $5,000 that Plaintiffs paid Defendant for the "Permits" line item was misappropriated to a use other than that for which it was entrusted. *See Littleton*, 942 F.2d at 555.

**C.      Damages**

**1.      Actual and Consequential Damages**

In light of the fact that the Court will enter judgment in favor of Plaintiffs on Plaintiffs' claim of fraud under 11 U.S.C. § 523(a)(2)(A), the Court will award Plaintiffs their actual and consequential damages. *See Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). The record demonstrates that Plaintiffs suffered actual damages, by transferring funds to Defendant, in the amount of $175,400.

Plaintiffs purportedly suffered consequential damages in the amount of $68,450 by incurring costs to correct work that Defendant performed incorrectly or did not perform.[4] The Court will not award any damages for Plaintiffs' purported costs to correct because Plaintiffs did not establish that they were proximately caused by the Defendant's fraud. *See Sabban*, 600 F.3d 1223; Restatement (Second) of Torts §§ 546, 548A (Am. L. Inst. 1976). The Court will not

---

[4] Plaintiffs only evidence of their purported consequential damages is the CSLB Industry Expert Report [Ex. 30]. Plaintiffs were not qualified as experts to testify as to pool construction damages. Plaintiffs did not provide expert testimony of the industry expert, any representative of the CSLB or a contractor qualified to testify as to pool construction damages.

award Plaintiffs any portion of their alleged consequential damages arising from payments made to Green Paradise to complete the Project because Plaintiffs received the benefit of such payments: a new pool.

### 2. Attorney's Fees and Costs

Although Plaintiffs are a prevailing party under § 523(a)(2)(A) and thus are entitled to attorney's fees and costs for services in connection with this adversary proceeding, those fees and costs must be reasonable. *See Sabban*, 600 F.3d at 1223-24; *Atwood*, 293 B.R. at 233; Cal. Bus. & Prof. Code §§ 7160, 7168.

As for the fees incurred in connection with Mr. Stevens' letter to Defendant's attorney about the Project, Plaintiffs have not submitted any documentary evidence showing that the amount they paid was $500. Accordingly, the Court will not award any fees which Plaintiffs incurred in connection with Mr. Stevens' letter to Defendant's attorney.

The Court has reviewed the billing records of Mr. Cirlin and Mr. Goldberg in connection with their representation of Plaintiffs in the State Court Action. Mr. Cirlin and Mr. Goldberg's hourly rates of $400 appear reasonable, based on other attorneys' hourly rates in the area. As such, the Court will award the fees and costs Plaintiffs incurred in connection with the State Court Action in the amount of $4,753.62.

The Court has also reviewed the billing records of Mr. Schlecter in connection with his representation of Plaintiffs in this adversary proceeding. Mr. Schlecter's hourly rate of $400 appears reasonable, based on other attorneys' hourly rates in the area. The fees and costs for which Plaintiffs seek an award includes only the services which Mr. Schlecter performed in connection with the adversary proceeding; they do not include fees and costs incurred in connection with Mr. Schlecter's representation of Plaintiffs as a creditor in Defendant's bankruptcy case. As for the fees Plaintiffs anticipate incurring in order for Mr. Schlecter to prepare for and appear at the hearing on the trial ruling set for December 19, 2024, the Court will not award such fees because no appearance is necessary. As such, the Court will award the fees and costs Plaintiffs incurred in connection with this adversary proceeding in the amount of $59,052.

### 3. *Prejudgment Interest*

In consideration of fairness, the Court also will award Plaintiffs prejudgment interest on Plaintiffs' actual damages, but not Plaintiffs' attorneys fees and costs. *See Acequia*, 34 F.3d at 818; *Levy-Zentner*, 74 Cal. App. 3d at 798. The Court, in its discretion, declines to apply a rate other than the federal interest rate. *See Acequia*, 34 F.3d at 818.

Pursuant to 28 U.S.C. § 1961, for the week preceding the date Plaintiffs commenced the State Court Action, the federal rate was 2.02%. *See Selected Interest Rates Instruments, Yields in percent per annum: Weekly*, Fed. Rsrv. Bank of St. Louis, https://fred.stlouisfed.org/release/tables?rid=18&eid=290&od=2022-06-09# (select "U.S. government securities," then "Treasury constant maturities," then "Nominal," then "1-year," then view column "Preceding Period") (last visited Dec. 23, 2024). Applying the 2.02% federal interest rate on the allowed principal of $175,400 yields a daily rate of interest in the amount of $14.71 (($175,400 × 2.02%) ÷ 365) = $9.71). There are 946 days from June 8, 2022, to January 9, 2025, the date for which the Court scheduled a hearing on the trial ruling. Accordingly, the Court will award Plaintiffs $9,182.89 in prejudgment interest ($9.71 × 946 = $9,182.89).

## IV. CONCLUSION

Under 11 U.S.C. § 523(a)(2)(A), the Court will enter judgment in favor of Plaintiffs in the amount of $248,388.51. Under 11 U.S.C. § 523(a)(4), the Court will enter judgment in favor of Defendant.

Plaintiffs must submit a proposed judgment within seven (7) days.

# # #

Date: January 7, 2025

Victoria S. Kaufman
United States Bankruptcy Judge

**NOTICE OF MEMORANDUM OF DECISION AFTER TRIAL AND SERVICE LIST**

Notice is given by the court that a memorandum entitled **MEMORANDUM OF DECISION AFTER TRIAL** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** -- Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of **January 7, 2025**, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- **Daren M Schlecter**    daren@schlecterlaw.com, assistant@schlecterlaw.com
- **David Seror (TR)**    dseror@bg.law, csalazar@bg.law;C133@ecfcbis.com;mgalvan@bg.law
- **United States Trustee (SV)**    ustpregion16.wh.ecf@usdoj.gov

☐    Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** On **January 7, 2025**, a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

**Defendant**
Steven Louis Miller
15021 Ventura Boulevard - #702
Sherman Oaks, CA 91403

☐    Service information continued on attached page

**III.  SERVED BY THE COURT VIA EMAIL:** On **January 7, 2025**, a true copy of this judgment or order was sent by email, to the following person(s) and/or entity(ies) at the address(es) indicated below:

**Defendant**
smiller@smillergroup.com

☐    Service information continued on attached page